IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RICKY MARTIN,             )
                           )
        Plaintiff,        )
                           )
    v.                )      CASE NO. 2:14-CV-905-WKW
                           )        [WO, PUBLISH]
RANDALL V. HOUSTON,   )
                           )
        Defendant.     )

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court is Defendant Randall V. Houston's Motion to Dismiss the First Amended Complaint (Doc. # 25), which has been fully briefed. Upon consideration of the pleadings, the arguments of counsel, and the relevant law, the motion will be denied.

## I.  JURISDICTION AND VENUE

Subject-matter jurisdiction is exercised pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202. The parties do not contest personal jurisdiction or venue.

## II.  STANDARDS OF REVIEW

When evaluating a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321–22 (11th Cir. 2012). To survive Rule 12(b)(6) scrutiny,

"a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject-matter jurisdiction. *McElmurray v. Consol. Gov't of Augusta–Richmond Cnty*., 501 F.3d 1244, 1251 (11th Cir. 2007).  On a Rule 12(b)(1) facial attack, the court evaluates whether the plaintiff "has sufficiently alleged a basis of subject matter jurisdiction" in the complaint and employs a standard similar to that governing Rule 12(b)(6) review.  *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1335 (11th Cir. 2013).  The court thus examines the pleadings and decides whether the plaintiff has alleged jurisdictional facts that are facially plausible.  *See id.*

## III.  BACKGROUND

Alabama enforces a sweeping statutory scheme regulating the activities of sex offenders.  *See McGuire v. Strange*, 83 F. Supp. 3d 1231, 1236 (M.D. Ala. 2015) (describing Alabama's sex offender scheme as the most "comprehensive" and "debilitating" in the country).  In addition to requiring that sex offenders register

with local law enforcement agencies, the Alabama Sex Offender Registration and Community Notification Act ("ASORCNA") limits where its registrants may live and work.  Ala. Code § 15-20A-1 *et seq.*  Plaintiff Ricky Martin ("Martin"), who serves as pastor of the Triumph Church in Clanton, Alabama, welcomed ASORCNA registrants into his congregation.  Alabama lawmakers passed a measure limiting Martin's ability to minister to his congregation, and this action ensued.  The relevant facts and procedural history will first be discussed.

**A.**   **Facts**

Martin is called to serve others.  As a man of the cloth, he believes, in keeping with his Christian faith, that he is duty bound to help those in need.  He followed that Christian calling by ministering to men incarcerated in Alabama correctional facilities.  His prison ministry brought him in contact with a number of sex offenders, many of whom had difficulty finding suitable housing upon their release from imprisonment.  Martin opened his Clanton property to them, establishing a small settlement for ASORCNA registrants.  He hoped to help them transition into society without running afoul of ASORCNA's stringent residential restrictions.[1]

---

[1] ASORCNA prohibits registrants from establishing or maintaining a residence within 2,000 feet of any "school, childcare facility, or resident camp facility."  Ala. Code § 15-20A-11.  It also prohibits registrants from living with certain minor children.  *Id.*

Martin owns a small parcel of property adjacent to Triumph Church in Clanton, Alabama.[2]  He set up five mobile homes on this parcel, all within 300 feet of each other.   Martin established a screening process for determining which registrants would be allowed to live in this settlement.  He required men living there to abide by a residency agreement, which prohibited tobacco use, fighting, possession of weapons and pornography, and use of foul language.  Martin also required that the men attend his church services, dress properly, keep the settlement tidy, and refrain from trespassing onto neighboring property.   Martin and his congregants held yard sales to support the ministry, and the community responded positively by purchasing the items they offered.  Martin only accepted registrants who were open to living according to Christian principles.

In addition to providing housing, Martin encouraged settlement residents to make healthy transitions back into free society.  He stressed to these men the importance of living a Christian life, which he believed would prevent them from repeating their criminal offenses.   He provided only temporary housing for settlement residents, requiring them eventually to find permanent homes.  The population living in his settlement was thus subject to constant change.  The new residents, who were recently released from prison, frequently replaced those residents securing permanent living arrangements.   Throughout the time Martin

---

[2] Martin and his wife also live adjacent to the property.

made the settlement available, approximately sixty men lived there. The settlement usually housed between twelve and fourteen men at a time.

State lawmakers adopted a measure that disrupted the operation of Martin's settlement. The statutory measure, which originated as House Bill 556, and is now codified at Alabama Code § 45-11-82 (the "Act"), provides that individuals whose names are listed on the Alabama sex offender registry may not establish residency in the same home. Ala. Code § 45-11-82(b)(1). The Act further provides that an ASORCNA registrant may not establish a residence on the same lot or property as another ASORCNA registrant unless the homes are at least 300 feet apart. Ala. Code § 45-11-82(b)(2). These provisions do not apply where ASORCNA registrants who wish to live together or establish residence near each other are married or related. Ala. Code § 45-11-82(b). The Act also provides that a "violation of subsection (b) shall constitute a public nuisance." Ala. Code § 45-11-82(c). It authorizes the district attorney to institute a civil action against the owner or lessor of property to abate such a nuisance. *Id.* The court hearing such an action is authorized, in its discretion, to assess a fine between $500 and $5,000 for each civil action. Ala. Code § 45-11-82(d). Of particular relevance is the fact that the Act applies only to Chilton County, Ala. Code § 45-11-82(a), which happens to be the locus of Martin's settlement.

Martin alleges that Alabama House Representative Kurt Wallace ("Wallace"), in concert with Houston, who is the District Attorney for Chilton County,[3] supported the Act's passage with the intent of forcing Martin to dismantle his ASORCNA residential settlement. The legislature first considered a bill that would have applied the same sex offender residency restrictions across the state. Martin alleges that the majority of the testimony the legislature heard regarding the initial statewide bill focused solely on his property. The legislature rejected the statewide version of the bill and instead opted for the Act's single-county approach.

Martin's church and settlement are located in Clanton, within the confines of Chilton County. Martin contends that this statute affected no property other than his settlement. He further alleges that Wallace and Houston confirmed, in interviews with local news media outlets, that their intention in passing the Act was to prevent Martin from maintaining his settlement ministry. Martin wrote Wallace while the Act was still under consideration, pleading with him to allow the continuation of his ministry. According to Martin, Wallace's response made it clear that the Act was designed to prevent ASORCNA registrants from living on Martin's property.

After the Act's passage, Martin received a visit from a Chilton County Sheriff's investigator. The investigator informed Martin that the Act would become

---

[3] Houston is sued in his official capacity as District Attorney for Chilton County, Alabama. Martin seeks only declaratory and injunctive relief. (Doc. # 1, at 3.)

effective on July 1, 2014.  He also encouraged Martin to speak with representatives from the Chilton County District Attorney's office regarding the Act's effect on his property use.  Martin heeded this advice and met with Assistant Chilton County District Attorney C.J. Robinson ("Robinson").  At their meeting, Robinson informed Martin that, because his settlement was not in compliance with the Act, Martin should evict all sex offenders living on his property.  Robinson further warned Martin that failure to do so would result in Martin being haled into court and fined per the Act's civil action provisions.

On June 30, 2014, the Chilton County District Attorney's office followed up by issuing an oral threat and written notice to Martin.  These warnings made it clear that the District Attorney intended to take action against Martin if he did not evict the settlement residents from his property within fourteen days.  Martin, fearing fines upwards of $60,000,[4] promptly evicted all of the men living on his property.  Had he not received the District Attorney's warnings, Martin would have continued housing ASORCNA registrants as part of his Christian ministry.

Martin alleges that the Act runs afoul of federal statutory and constitutional law.  Specifically, in the First Cause of Action, he alleges that the Act places a

---

[4] The Act provides a fine of up to $5,000 for each violation.  Ala. Code § 45-11-82(d).  At the time the Martin received this written notice, he was housing twelve registered sex offenders on his property.  Martin believes that the District Attorney could have brought twelve separate civil actions against him at that time.

substantial burden on his free exercise of religion in violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA").  In the Second Cause of Action, he alleges that the Act infringes upon his right to free exercise of religion under the First Amendment.    The Third Cause of Action challenges the Act as an unconstitutional bill of attainder, and the Fourth Cause of Action raises a procedural due process claim pursuant to the Fourteenth Amendment.

## B.   **Procedural History**

Martin filed his complaint in August of 2014.  He initially named two defendants, but Kevin Davis was dismissed pursuant to Rule 41 of the Federal Rules of Civil Procedure.  (Doc. # 27.)  Defendant Houston filed a motion to dismiss Martin's complaint (Doc. # 15), but Martin sought and was granted leave to file an amended complaint.  (*See* Docs. # 22, 28, 29, and 30.)  Because the amended complaint (Doc. # 22) was ultimately deemed filed, Houston's motion to dismiss the initial complaint was denied as moot.  (Doc. # 30.)

Houston then filed a motion to dismiss the amended complaint (Doc. # 25), which is now before the court.  Houston filed a brief in support of the motion (Doc. # 26), Martin filed a response (Doc. # 31),[5] and Houston filed a reply (Doc. # 34).

---

[5] Martin also filed two notices of supplemental authority in support of his brief in opposition to the motion to dismiss.  (Docs. # 32 and 33.)

8

# IV.  DISCUSSION

In the motion now before the court, Houston seeks dismissal of all claims raised in the amended complaint.  He first argues that the claims should be dismissed for lack of subject-matter jurisdiction, contending that Martin's as-applied challenges are not justiciable.  *See* Fed. R. Civ. P. 12(b)(1).  In the alternative, he contends that each cause of action fails to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  Issues of justiciability will be addressed first.  Then he merits of the First through Fourth Causes of Action will be addressed respectively.

## A.    <u>Whether Martin's As-Applied Claims Are Justiciable</u>

Despite Houston's contentions to the contrary, Martin's as-applied challenges are justiciable.  The thrust of Houston's argument is that, because Martin chose to evict settlement residents before the District Attorney initiated a civil action, any as-applied challenges to the Act are not ripe for adjudication.  Though he concedes that the ripeness inquiry should not affect Martin's bill of attainder claim in the Third Cause of Action (*see* Doc. # 26, at 8), with respect to the remaining claims in the amended complaint, he argues that Martin can only proceed with facial challenges.  For the following reasons, Houston's argument does not carry the day.

The doctrine of ripeness, which is a creature of Article III and prudential standing concerns, is aimed at avoiding premature judicial intervention.  *Temple*

*B'Nai Zion, Inc. v. City of Sunny Isles Beach*, 727 F.3d 1349, 1356 (11th Cir. 2013). Rather than grappling with undeveloped factual situations, federal courts should only decide cases and controversies that are sufficiently concrete for judicial determination.  *See id.*  Determining whether a matter is ripe for consideration involves a two-step inquiry.  *Midrash Shepardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1224 (11th Cir. 2004).  First, the court should evaluate the fitness of the issues for judicial determination.  *Id.*  Second, the court should consider the hardship the parties would face if it withheld its consideration.  *Id.*

### 1.    *The Finality Rule Is Inapplicable*

Where the claims brought for judicial resolution involve certain land use regulations, the ripeness doctrine may apply in a nuanced fashion.  Land use claims are unique in that they often demand especially concrete facts for appropriate resolution.  *Temple B'Nai*, 727 F.3d at 1356.  In light of these unique demands, the Supreme Court has held that where a landowner challenges the application of a zoning ordinance, he must obtain a final decision regarding the application of the zoning ordinance before his claim can be considered justiciable.  *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985).  Though *Williamson County* arose from a takings dispute, its reasoning has been applied in broad range of land use contexts.  *See Temple B'Nai*, 727 F.3d at 1356.  The finality rule has been extended to claims arising under RLUIPA, the free

exercise clause of the First Amendment, and the due process clause of the Fourteenth Amendment. *Id.*

The finality rule recognized in *Williamson County*, however, does not apply invariably whenever a landowner challenges land use regulations.  The Eleventh Circuit has recognized that, under certain circumstances, the finality of the land use decision has little bearing on the ripeness of the issues presented.  *Temple B'Nai*, 727 F.3d at 1357 (citing *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 92 (1st Cir. 2013) and *Dougherty v. Town of N. Hampstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002)).  In *Temple B'Nai*, the Eleventh Circuit held that the finality rule should not apply where the plaintiff suffered injury at the moment of the land use regulation's implementation and further review of the regulation would not advance the plaintiff's remedial cause.  *Id.*  This is especially true where, as in *Temple B'Nai*, the plaintiff contends that the government's decision to regulate the property was motivated by "discriminatory animus."  *Id.*  In such a case, the justiciability of the claims turns on the traditional two-factor ripeness analysis without consideration of finality.  *See id.*

The issues presented in Martin's case are appropriate for traditional ripeness review, and the *Williamson County* finality rule does not factor into the calculus. Martin arranged the mobile homes in his settlement such that unrelated resident sex offenders lived within 300 feet of each other.  Under the plain meaning of the Act's

language, this arrangement constitutes "a public nuisance."  Ala. Code § 45-11-82(c).  Houston, in an attempt to bolster his ripeness arguments, urges consideration of certain hypothetical interpretations of the Act.  The Circuit Court of Chilton County might have, for example, decided to grandfather current residents into the Act's scheme, allowing those already living on Martin's property at the time of enforcement to remain thereon.  (*See* Doc. # 26, at 11.)  Or the court might have allowed Martin to prove that his settlement does not in fact constitute a public nuisance.  (*See* Doc. # 26, at 10.)  These exhortations, though laudably imaginative, are not persuasive.

As for the purported grandfathering hypothetical, this scenario ignores the fact that Martin offered only temporary housing and required settlement residents to quickly find permanent homes.  The population of the settlement necessarily turned over rapidly such that those residents who might have been allowed to stay under a grandfathering scheme would quickly have moved on to more permanent environs. Because the Act would still have affected new residents, Martin would have suffered the same hardship even if this fanciful grandfathering scenario came to fruition. Grandfather would disappear before he had time to take off his shoes.

With respect to the scenario in which Martin might be allowed to argue that his settlement does not in fact constitute a public nuisance, the statutory language flatly forecloses this possibility.  There can be no mistaking the Act's clear directive:

12

Where registered sex offenders reside within 300 feet of each other, their living arrangement constitutes a public nuisance—full stop. *See* Ala. Code § 45-11-82(c) (employing of the mandatory "shall" without qualification).

Had Martin decided not to evict the residents, and had the District Attorney brought a civil action pursuant to the Act, Martin would have been liable for maintaining a public nuisance. The only effect of allowing the situation to develop toward final judicial action would be to determine the size of the fine to be assessed in a state court. *See* Ala. Code § 45-11-82(d). Martin has also alleged, as was the case in *Temple B'Nai*, that some discriminatory motivation is at work in the implementation of the Act's regulation of his land use. 727 F.3d at 1357. That is, he alleges that the legislature passed this measure in a targeted effort to dismantle his religious settlement in violation of his First Amendment rights. On the occasion of this motion to dismiss, where factual allegations are treated as true and construed in the light most favorable to Martin, the pleadings indicate that the finality rule should not factor into the ripeness determination. Martin's allegations suggest that he suffered an injury at the time of the Act's passage and allowing further civil action would do nothing further to define his injury. *Id.*

### 2. *Martin's As-Applied Challenges Are Ripe*

Because the scenario at bar does not call for application of the *Williamson County* finality rule, Martin's claims will be analyzed under the traditional two-

13

factor ripeness analysis.  *See id.*  Martin's claims are fit for judicial review, and Martin will face substantial hardship if they are not adjudicated.  *See Midrash Shepardi*, 366 F.3d at 1224.  These findings will be addressed in more detail below.

Martin's claims, to the extent they raise as-applied challenges to the Act, are fit for judicial determination.  This prong of the ripeness inquiry, which implicates prudential case or controversy concerns, focuses on whether the impact of the challenged law is sufficiently "direct and immediate" to render it appropriate for adjudication.  *Id.* at 1225.  Though it is unclear the amount Martin would have been fined had he continued his settlement ministry, Martin's allegations are sufficient to indicate that his settlement, as it existed, constituted a public nuisance under the meaning of the Act.  He contends that residents of his settlement, all of whom are ASORCNA registrants, lived within 300 feet of each other.  He also alleges that the District Attorney's office warned him, in clear language, that it intended to pursue civil action to abate this public nuisance if he did not cease the settlement's operation.

The gravamen of Martin's RLUIPA, First Amendment, and Due Process claims is that the passage of the Act itself, in part because it affects his property alone, infringes upon his religious liberty and denies him due process.  *See Temple B'Nai*, 727 F.3d at 1357 (holding the issues presented to be justiciable in part because the complaint alleged an injury stemming from the challenged governmental

act itself).  It is clear from the Act's language that it applied to Martin's property. The impact of the Act on Martin's use of his land, as early as the time of its passage, is thus direct and immediate.  An as-applied challenge is fit for judicial review without further factual development.

Martin's allegations are also sufficient to indicate that he would face substantial hardship if he were not allowed to pursue these claims at this time.  *See Midrash Shepardi*, 366 F.3d at 1224.  As things currently stand, Martin is unable to carry out his ministry.  Under threat of imminent civil action, Martin evicted residents from his settlement.  He now stands between the devil and the deep blue sea.  Martin can re-establish his settlement in violation of the Act and face certain civil action, or he can continue to neglect what he believes to be his Christian duty of service.  *See Steffel v. Thompson*, 415 U.S. 452, 462 (1974).  Under these circumstances, to deny Martin judicial review would result in substantial hardship.

Accordingly, Martin's pleading is sufficient to state claims that are plausibly ripe for judicial consideration.  *See* Fed. R. Civ. P. 12(b)(1).  Though he decided to evict his residents, the allegations in the amended complaint nonetheless indicate that his claims are ripe for review.  This is true even to the extent his claims raise as-applied challenges to the Act.

**B.**     **Martin's RLUIPA Claim (First Cause of Action)**

In his First Cause of Action, Martin alleges that the Act imposes a substantial burden on his religious exercise in violation of RLUIPA.  Houston contends that this cause of action is due to be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  More specifically, Houston argues that the Act neither poses a substantial burden on Martin's exercise of religion nor constitutes a land use regulation within the meaning of RLUIPA.  Martin will be ordered to show cause why his RLUIPA claim in the First Cause of Action should not be dismissed for lack of subject-matter jurisdiction.

Congress enacted RLUIPA with the intention of ensuring broad religious liberty protections.  *Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015).  RLUIPA provides, in relevant part, that "no government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person." 42 U.S.C. § 2000cc(a)(1).  If the land use regulation in question does impose a substantial burden on religious exercise, the government must demonstrate that the regulation furthers a compelling governmental interest and is the least restrictive means of doing so.  *Id.*

RLUIPA's land use regulation provision only applies, however, where one of three jurisdictional prerequisites is met:  (1) the land use regulation that allegedly imposes a substantial burden is implemented as part of a plan or activity that receives

federal funding; (2) the substantial burden affects, or its removal would affect, interstate commerce; or (3) the substantial burden arises from the state or local government's procedures for making individualized assessments of proposed property use.  42 U.S.C. § 2000cc(a)(2); *Midrash Shepardi*, 366 F.3d at 1225.  Most of the issues raised in the motion to dismiss regarding Martin's RLUIPA claim will not be addressed.  This is because, pursuant to these jurisdictional prerequisites, Martin has failed to allege facts sufficient to indicate that the Act falls within the scope of RLUIPA's land use regulation provision.  *See* 42 U.S.C. § 2000cc(a)(2)(A)–(C).

To invoke RLUIPA's land use provision, a plaintiff must show that the land use regulation at issue invokes one the scenarios contemplated by the statute.  *See* 42 U.S.C. § 2000cc(a)(2); *see also Prater v. City of Burnside*, 289 F.3d 417, 433 (6th Cir. 2002) (holding that a plaintiff may not proceed with an RLUIPA claim unless she demonstrates that the particular facts invoke one of the three statutory bases of jurisdiction).  Notwithstanding his arguments relating to ripeness of Martin's RLUIPA challenge, Houston does not contend that Martin's RLUIPA claim fails to allege a statutory basis of subject-matter jurisdiction.  But because these prerequisites have been characterized as jurisdictional, *see Midrash Shepardi*, 366 F.3d at 1225, they will be addressed at this time.  *See Univ. S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999) ("[I]t is well settled that a federal

court is obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking.").

The jurisdictional prerequisites ascribed to RLUIPA's land use provision limit the statute's scope. 42 U.S.C. § 2000cc(a)(2). Martin's complaint contains no allegations leading to the plausible conclusion that the Act imposes a substantial burden in a manner that affects interstate commerce. 42 U.S.C. § 2000cc(a)(2)(B). Nor has Martin alleged that the Act is part of a program or activity that receives federal funding.[6] 42 U.S.C. § 2000cc(a)(2)(A). It may be that the passage of the Act and the injury Martin suffered in fact invoke the circumstances contemplated by prerequisites (A) or (B), but it is difficult to say so without any factual allegations suggesting this is the case. The amended complaint does contain some factual allegations indicating that the Act is a land use regulation in which the state makes individualized assessments of the use of a property. 42 U.S.C. § 2000cc(a)(2)(C). These allegations ultimately are insufficient, however, to invoke subject-matter jurisdiction over Martin's RLUIPA claim.

---

[6] RLUIPA defines "program or activity" to include all activities of "a department, agency, special purpose district, or other instrumentality of a State or of a local government . . . any part of which is extended Federal assistance." 42 U.S.C. § 2000d-4a(1)(A). The definition also includes "the entity of such State or local government that distributes such [federal financial] assistance." 42 U.S.C. § 2000d-4a(1)(B). Whether the activities of the Alabama legislature or the Chilton County District Attorney fall within the ambit of this statutory definition is unclear from the allegations contained in the amended complaint. Nor does Martin contend that discovery is necessary to ascertain such information.

Though the allegations in the amended complaint suggest that the passage of the Act involved an individualized legislative assessment of Martin's property use, they are insufficient to plausibly allege that this legislative decision related to any *proposed* use of Martin's property. *See id.* The use of "proposed" in the statute indicates that, with respect to the individualized assessment jurisdictional prerequisite, only forward-looking assessments of property use are actionable under the statute. *See id.* Where, for example, a landowner applies for and is denied a special use permit prior to constructing a new improvement to his property, the government entity denying the permit has made an individualized assessment of the proposed use of the landowner's property. *See Midrash Shepardi*, 366 F.3d at 1225; *Living Water Church of God v. Charter Twp. of Meridian*, 384 F. Supp. 2d 1123, 1131 (W.D. Mich. 2005), *rev'd on other grounds*, 258 F. App'x 729 (6th Cir. 2007). But where the state action in question is backward-looking, it cannot be fairly said to involve an individualized assessment of the proposed use of the land.

The Act, though it might impose some burden on Martin's exercise of religion, makes a backward-looking determination of living arrangements such that it does not involve an individualized assessment of a proposed use of property. *See* 42 U.S.C. § 2000cc(a)(2)(C). The Act does not involve any system of granting land use permits, nor does it provide for an application process for land owners seeking a variance from the mandatory public nuisance finding. It merely provides, *post hoc*,

that a violation of the 300-foot rule shall constitute a public nuisance.  The legislature may have made this decision based upon its individualized judgments about Martin's settlement, but the passage of the Act did not involve any consideration of a proposed use of Martin's property.  *See id.*  Accordingly, the land use regulation provision of RLUIPA does not countenance Martin's challenge.

Though it may be possible for Martin to adequately plead one of RLUIPA's jurisdictional prerequisites, he failed to do so in the amended complaint. Accordingly, in light of the jurisdictional nature of the land use provision prerequisites, the allegations do not clearly support the finding that this court has jurisdiction to hear Martin's RLUIPA claim.[7]  *See Midrash Shepardi*, 366 F.2d at 1225; *Univ. S. Ala. v. Am. Tobacco Co.*, 168 F.3d at 410.  Martin will be directed, by separate order, to show cause why this claim should not be dismissed for failure to plead a statutory basis of subject-matter jurisdiction.  Houston will be given an opportunity to respond.  As it relates to the First Cause of Action, Houston's motion to dismiss will be denied.

---

[7] Though the allegations do not clearly support the court's subject-matter jurisdiction to hear this claim, Houston's motion did not seek dismissal on these grounds.  Accordingly, Houston's motion will be denied, and these issues will be addressed in conjunction with the separate show cause order.

**C.**   **Martin's Free Exercise Claim (Second Cause of Action)**

Martin's Second Cause of Action alleges that the Act violates his First Amendment right to free exercise of religion.  The First Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment,[8] provides that "Congress shall make no law . . . prohibiting the free exercise of religion."  U.S. Const., amend. I.  The free exercise clause thus protects against laws that prohibit conduct because of the conduct's religious motivations.  *Church of Lukumi Babalou Aye v. City of Hialeah*, 508 U.S. 520, 532 (1993).

To survive a motion to dismiss, Martin must sufficiently allege that the Act creates a burden on his sincerely held religious beliefs.  *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1256 (11th Cir. 2012).  The sufficiency of the allegations to support these elements of the *prima facie* case will be addressed first.  The applicable level of constitutional scrutiny will then be determined and applied.  As it relates to the Second Cause of Action, Houston's motion to dismiss will be denied.

**1.**   ***Martin Has Sufficiently Pleaded a Free Exercise Claim***

To adequately plead a free exercise claim under the First Amendment, Martin must allege that he "holds a belief . . . that is religious in nature" and that "the law at issue in some way impacts [his] ability to either hold that belief or act pursuant to that belief."  *GeorgiaCarry.Org*, 687 F.3d at 1256–57.  The allegations, taken as true

---

[8] *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

and construed in the light most favorable to Martin, are adequate to support such a claim. Martin's pleading indicates that he holds sincere religious beliefs. As part of his Christian faith, he feels that he has a duty to serve others. He especially is compelled to serve those in need of help, and ASORCNA registrants fall into that category.

Martin's allegations are also sufficient to plausibly suggest that the Act impacts his ability to act pursuant to that belief. Though Martin believes that he is called to use his property to minister to ASORCNA registrants by providing a temporary home for them, the Act prevents him from using his property in that way. It is true, as Houston contends, that Martin is free to establish a similar settlement outside the confines of Chilton County. As Houston would have it, this "anywhere but here" possibility is a ministry-neutral feature that does not impermissibly burden Martin's ability to exercise his religion. This is not so.

It first bears mentioning that at the motion to dismiss stage of the litigation, the facts alleged in the complaint are to be taken as true. *Resnick*, 693 F.3d at 1321–22. There has been no discovery with respect to Martin's ability, financially, personally, or otherwise, to relocate his settlement ministry. The evidence adduced throughout the litigation may demonstrate that Martin will face insurmountable hurdles in acquiring new property in a different county. Whether doing so is in fact impermissibly burdensome will depend upon the particular details of Martin's

situation, which have not been fully developed.  *See Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 76–77 (1981) ("[T]here is no evidence in the record to support the proposition that the kind of entertainment appellants wish to provide is reasonably available in other areas. . . . '[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'") (quoting *Schneider v. State*, 308 U.S. 147, 163 (1939)).  Martin has alleged that the Act forced him to cease his ministry, which he carried out in furtherance of his religious beliefs.  He further alleges that, if not for the Act's implementation, he would have been able to carry out his spiritual duty by continuing his residential Christian ministry.  These allegations are sufficient to state a plausible claim for relief.  *See Iqbal*, 556 U.S. at 678.

According to Houston, the fact that Martin is able to carry on with his settlement in a different location means that the Act does not in fact "prohibit" him from exercising his religion or "coerce" him into forbearing his religious duty.  *See Lyng v. Nw. Indian Cemetery Ass'n*, 485 U.S. 439, 450 (1988) (holding that, based on the constitutional use of the word "prohibit," the state only impermissibly burdens free exercise of religion where it coerces an individual to act contrary to his religious convictions); *Bowen v. Roy*, 476 U.S. 693, 707–08 (1986) (holding that a condition placed on the distribution of a government benefit does not impermissibly burden the free exercise of religion where it merely incidentally affects the claimant's ability

to receive the government benefit while still exercising her religious beliefs).[9]  The principle announced in *Lyng* does not foreclose Martin's free exercise claim on the basis of the pleadings.  *See* 485 U.S. at 450.  Martin has specifically alleged that the Act in fact prohibits him from carrying out duties attendant to his Christian faith.  His factual allegations further suggest that, instead acting for neutral reasons, the legislature designed the Act with the purpose of coercing Martin into ceasing his ministry.  As for *Bowen*, that case is distinguishable in that it deals only with conditions on the provision of government benefits.  *See* 476 U.S. at 707–08.  Martin's ability to use his private property in furtherance of his sincerely held spiritual convictions is far different than a government beneficiary's ability to enjoy

---

[9] Houston also cites *Eagle Cove Camp & Conference Center Inc. v. Town of Woodboro* in support of his motion to dismiss Martin's free exercise claim.  734 F.3d 673.  In that case, the Seventh Circuit decided first that the challenged government act did not pose a substantial burden on the claimant's religious exercise for purposes of an RLUIPA claim.  *Id.* at 682.  It then decided that, because the government act did not pose a substantial burden within the meaning of RLUIPA, the claimant's free exercise claim under the First Amendment should also fail.  *Id.*

Houston makes little effort to apply the holding of this case to the facts at bar.  He merely quotes the word "collapse" in reference to the similarities between RLUIPA and free exercise analyses.  (Doc. # 26, at 22.)  The apparent thrust of this holding is that, where a regulation does not pose a substantial burden under RLUIPA, because of the similarities between free exercise and RLUIPA claims, it follows that the regulation cannot pose an impermissible burden on the free exercise of religion.  *Id.*

This decision is not binding. And because no finding is made with respect to whether the Act poses a substantial burden on Martin's claim for RLUIPA purposes, the reasoning of *Eagle Cove* is inapposite for purposes of determining whether the Act poses an impermissible burden on Martin's free exercise for First Amendment purposes.  *Eagle Cove* is unpersuasive with respect to the free exercise analysis, as are the other cases Houston cites in support of his argument that the Act does not pose a substantial burden under RLUIPA.

an entitlement without suffering incidental religious inconvenience.  *See id.*
Martin's alleged injury is direct, not incidental.

Martin's pleading is sufficient to state a plausible claim under the free exercise
clause.  The factual allegations plausibly support his claim that the Act poses an
impermissible burden on the exercise of his sincerely held Christian beliefs.
Attention next turns to the level of constitutional scrutiny that should be applied.

### 2.   *Whether the Act Withstands Constitutional Scrutiny*

Because Martin has sufficiently alleged that the Act imposes an impermissible
burden on his sincere religious beliefs, the proper brand of constitutional scrutiny
must be ascertained.  Generally, where the law in question is facially neutral and of
general applicability, it survives so long as it is rationally related to a legitimate
governmental interest.  *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S.
872, 878 (1990); *GeorgiaCarry.Org*, 687 F.3d at 1255 n.21.  However, even a
neutral law of general applicability must withstand a heightened level of
constitutional scrutiny where it targets unpopular religious activity by way of
"religious gerrymander."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520, 535, 531–32 (1993) (quoting *Walz v. Tax Comm'n of New York City*,
397 U.S. 664, 696 (1970) (Harlan, J., concurring)).  Where the purpose of the law is
to restrict conduct because of its religious nature, it must be narrowly tailored to
further a compelling governmental interest.  *Id.* at 533.

The factual allegations in Martin's complaint are sufficient to support the plausible inference that the purpose of the Act is to restrict Martin's conduct because of its religious nature. Martin contends that the legislature passed the Act with the specific intent of forcing Martin to cease his ministry. The Act is limited to Chilton County, and Martin alleges that numerous news reports confirm lawmakers' intention to affect only his settlement. He further alleges that the Act allows similar, non-religious sex offender clusters to exist unabated where the registrants are related. It is reasonable to infer, based on these allegations, that the state put the Act in force in order to restrict Martin's conduct because of its religious nature. It may be that, in later proceedings, the facts reveal a non-religious motivation for the Act's implementation. But at this stage, it cannot be said that Martin's allegations are insufficient to support this reasonable inference. *See Iqbal,* 556 U.S. at 678.

Because the allegations support the finding that the Act impermissibly targets Martin's activity because of its religious nature, *Church of Lukumi* requires that the Act be analyzed under strict constitutional scrutiny. 508 U.S. at 531–32. On this record, the Act cannot be said to further a compelling governmental interest in a narrowly tailored manner. Even if the Act serves a compelling governmental interest in preventing some type of harm posed by the clustering of sex offenders, it allows them to live in clusters so as long as the sex offenders are related. What is more, it allows the same clustering to take place throughout the other sixty-six counties in

the state.  This indicates that the Act proscribes some conduct that is protected by the First Amendment, but fails to restrict other conduct that inflicts the same harm the Act was designed to prevent.  *See id.* at 546–47.  The underinclusiveness of the Act is enough to suggest that it is not narrowly tailored to address whatever evil it was intended to reach.  At least for purposes of this motion to dismiss, it cannot be said that the Act can withstand constitutional scrutiny.

Accordingly, as it relates to Martin's free exercise claim in the Second Cause of Action, Houston's motion to dismiss will be denied.  Martin's factual allegations are sufficient to state a plausible claim for relief.  *See Iqbal*, 556 U.S. at 678.

## D.  <u>Martin's Bill of Attainder Claim (Third Cause of Action)</u>

In his Third Cause of Action, Martin alleges that the Act constitutes an unlawful bill of attainder.  The U.S. Constitution provides that "[n]o State shall . . . pass any bill of attainder."  Art. I, § 10.  A law constitutes a bill of attainder if it "legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial."  *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977).  In support of his motion to dismiss this cause of action, Houston contends that the Act neither singles out Martin nor imposes punishment without a judicial trial.

### 1.    *Whether the Act Singles Out Martin*

The constitutional provision prohibiting bills of attainder was born out of fear that federal or state legislatures might, as the English Parliament had done in earlier years, punish individually designated persons or groups without trial.  *United States v. Brown*, 381 U.S. 437, 447 (1965).  Historically, these bills of attainder often named the particular persons to be punished.  *Selective Serv. Sys. v. Minn. Pub. Research Grp.*, 468 U.S. 841, 847 (1984).  The Supreme Court has recognized, however, that this constitutional provision also prohibits, more broadly, enactments that name or describe an individual or a group of individuals "in terms of conduct which, because it is past conduct, operates only as a designation of particular persons." *Id.* (quoting *Communist Party of the United States v. Subversive Activities Control Bd.*, 367 U.S. 1, 86 (1961)).  The conduct described in the statute is thus essential to the attainder inquiry.  Where the past conduct is the reference point by which the person to be punished is ascertained, the enactment may constitute an unlawful attainder.  *Selective Serv. Sys.*, 468 U.S. at 847.

In some cases, the bill in question imposed punishment on the basis of an irreversible action on the part of the individual or group.  *Id.* at 848.  *See also Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 327 (1867) (striking down a Missouri constitutional provision on bill of attainder grounds because it rendered a particular group of individuals ineligible to enter the priesthood based solely on their past,

irreversible actions in support of the Confederacy during the U.S. Civil War).  But at least one early American tribunal also recognized, in a case the Supreme Court has quoted with approval, that the conduct described in the act need not be irreversible to counsel the finding that the act is an unconstitutional bill of attainder. *See Gaines v. Buford*, 31 Ky. (1 Dana) 481, 510 (Ky. 1833); *Cummings*, 71 U.S. (4 Wall.) at 324 (quoting *Gaines*, 31 Ky. (1 Dana) at 510).

In *Gaines*, the Kentucky high court recognized that a legislative act may constitute a bill of attainder where it singles out a person and commands him to take certain action or face punishment.[10]  31 Ky. (1 Dana) at 510 ("[Bills of attainder] have generally been applied to punish offenses already committed; but they have been and may be, applied to the punishment of *those thereafter to be committed*, or for criminal *omissions thereafter incurring*.") (emphasis added).  Drawing from historical examples of British acts of parliament, the Kentucky court noted that an act would constitute a bill of attainder if it "declare[d] that if certain individuals or a class of individuals, failed to do a given act by a named day, they should be deemed to be, and treated, as convicted felons or traitors."  *Id.*  The *Gaines* court further intimated that such an act would impose punishment for past conduct without an opportunity for a trial because "the prisoner when brought to the bar, [would be]

---

[10] Before 1976, the Court of Appeals was Kentucky's highest court.  The Bluebook: A Uniform System of Citation 265 tbl. T 1 (Columbia Law Review Ass'n et al. eds., 20th ed. 1st prtg. 2015).

merely asked what he has to allege why the execution should not be awarded against him." *Id.*  Though the court in *Gaines* couched the past conduct in criminal terms of felony or treason, the act in question related to property rights rather than criminal prosecution. *Id.* at 481.  Specifically, the case involved a Kentucky law that required forfeiture of real property for failure to use it in a manner prescribed by law. *See id.*

Based on the reasoning of *Gaines*, which the Supreme Court endorsed in *Cummings*, Martin's allegations plausibly support the finding that the Act singles him out for punishment by reference to his past conduct.  In the amended complaint, Martin alleges that the Act describes conduct in which he was particularly engaged through operation of his settlement ministry.   He established residences for registered sex offenders, all of which were located on the same property and within 300 feet of each other.  Martin alleges that no other property is subject to the terms of this statute.  It is Martin's past conduct that identifies him as being subject to the Act's proscriptions.  And as with the Parliamentary bill discussed in *Gaines*, the Act declares that if Martin does not do a given act by a certain day—dismantle his settlement by July 1, 2014—he will be liable for maintaining a public nuisance. *See id.*

This is not a case in which Martin is free to register his settlement and happily continue his ministry in compliance with the Act. *See Communist Party*, 367 U.S. at 87.  If he does not dismantle his settlement by that date, he will be haled into court

to show cause why he should not be fined.  The allegations suffice to sustain the finding that the Act singles out Martin based on past conduct.

### 2.   *Whether the Act Imposes Punishment Without Trial*

To ascertain whether a legislative act imposes punishment within the meaning of bill of attainder jurisprudence, courts may venture beyond the bounds of conventional criminal sentences.  *Nixon*, 433 U.S. at 475–76.  Though the classic bill of attainder formulation contemplates a death sentence, the constitutional provision has been interpreted to apply where the legislature enacts bills of "pains and penalties," which inflict punishments other than execution.  *Id.* at 474.  These pains and penalties include imprisonment, banishment, confiscation of property, and exclusion from certain vocations.  *Id.*  Where a claimant challenges some form of punishment that has not yet been recognized as falling within the scope of the bill of attainder clause, courts should apply a functional approach to determine whether the penalty is constitutionally actionable.  *Id.* at 475.  Where the legislative action admits of no legitimate, non-punitive purpose, it is reasonable to treat the penalty it imposes as a punishment within the scope of the bill of attainder clause.  *Id.* at 475–76.

It is true, as Houston notes, that the Act is ostensibly related to the non-punitive purposes of promoting public safety, protecting the character of Chilton County, and protecting sex offenders from vigilante justice.  But these proposed justifications ring hollow when examined in light of what the Act does not proscribe.

Namely, it does not proscribe the establishment of an identical sex offender settlement in any other county in the state. The legislature made no finding that 300 feet in Chilton County is somehow closer than 300 feet in, say, Choctaw County. Nor does the Act prohibit sex offenders from clustering on the same property in Chilton County where they are related by varying degrees of familial proximity. The limited reach of the Act suggests that, rather than being enacted to serve these non-punitive purposes, the Act is meant to prevent Martin alone from using his Chilton County property in the manner he chooses.

The Act inflicts punishment in two possible respects. First, if Martin chooses to continue using his property in furtherance of his religious convictions, he faces a functionally mandatory public nuisance finding, an action to abate the nuisance— which the District Attorney's office promised it would initiate, and a possibly substantial civil fine. Second, if Martin chooses to dismantle his settlement, as he did here, he is punished by virtue of his inability to make use of his property in the manner he sees fit as motivated by his religious beliefs. Whether the focus is on the manner in which the action forces Martin to dismantle his settlement by a certain date, *see Gaines*, 31 Ky. (1 Dana) at 510, or on the manner in which the Act forces Martin to abandon an endeavor he is otherwise entitled to pursue, *see Cummings*, 71 U.S. (4 Wall.) at 327, the allegations support the reasonable inference that the Act inflicts a form of punishment on Martin.

The extent of the pain that Martin feels as a result of the Act's passage is yet to be determined.  The facts adduced at later stages of the proceedings may illuminate the extent of his injuries in light of his own financial and personal circumstances, and these facts will inform the ultimate resolution of the bill of attainder inquiry.  But on the occasion of this motion to dismiss, review is limited to the plausibility of the factual allegations, which are treated as true.  *Resnick*, 693 F.3d at 1321–22.  It is not entirely clear whether the Act, due to its limited scope, and at least upon consideration of the factual allegations currently before the court, furthers any non-punitive purpose.  Accordingly, Martin has sufficiently pleaded the punishment elements of this bill of attainder claim.

Martin's allegations are also sufficient to support the conclusion that the Act imposes this punishment without the benefit of a trial.  Though the amount of the fine to be assessed depends on the outcome of judicial proceedings, the Act legislatively determines that Martin's settlement as it existed constitutes a public nuisance.  Houston contends that the Chilton County court may have grandfathered residents into the scheme or allowed Martin to argue that his settlement did not in fact constitute a public nuisance, but the plain language of the Act does not support the viability of these hypothetical scenarios.  In this respect, the Act mirrors the historical example discussed in *Gaines*.  31 Ky. (1 Dana) at 510.  The Act directs

Martin to dismantle his settlement or be called to answer a civil action in which his only recourse is to show cause why he should not be fined. *See id.*

Houston argues, in reliance on *Zilich v. Longo*, that the Act does provide for a judicial trial because it allows the District Attorney to bring a civil action. 34 F.3d 359. The ordinance at issue in *Zilich* was different from the Act, however, in that it merely authorized the city's law director to initiate a civil action to recover certain monies in the plaintiff's possession. *Id.* at 361. The ordinance at issue there did not determine, as a matter of law, that the city was entitled to recover the monies. *Id.* It merely authorized the institution of legal action. *Id.* n.2 (The ordinance provided, in relevant part, that it authorized the "Director of Law to take whatever action is necessary, legal or otherwise, to collect the salary received by former Councilman George Zilich during his previous two year term."). The Act, in contrast, describes the arrangement existing at Martin's settlement and conclusively determines that it is a public nuisance. The purpose of any civil action is merely to determine the fine to be imposed.

Upon consideration of the circumstances and the relevant law, Martin's factual allegations are sufficient to sustain his bill of attainder claim in the Third Cause of Action. Accordingly, Houston's motion to dismiss will be denied as it relates to this claim.

34

E.   __Martin's Due Process Claim (Fourth Cause of Action)__

Relying on the procedural variety of due process protection, Martin contends in his Fourth Cause of Action that the Act deprives him of his Fourteenth Amendment rights.  To properly state a claim for deprivation of procedural due process rights, Martin must sufficiently plead three elements:  (1) deprivation of a constitutionally protected interest; (2) state action, and (3) constitutionally inadequate process.  *Arrington v. Helms*, 438 F.3d 1336, 1347 (11th Cir. 2006). Houston does not dispute the first and second elements of Martin's claim.  Houston does dispute, however, whether the Act affords Martin inadequate process.  The first two elements of Martin's claim will be addressed briefly.  The third element will then be addressed in detail.  Houston's motion was denied as to Martin's Fourth Cause of Action.

1.   *Deprivation of Constitutionally Protected Interest and State Action*

Martin has sufficiently pleaded the first two elements of his procedural due process claim.  He alleges that the Act deprives him of the right to use his property for a legal purpose.  He further alleges that the Act is the product of state legislative process and that the Chilton County District Attorney's office notified him that it would enforce the Act against him.  These allegations support the finding that Martin has been deprived of a constitutionally protected interest by virtue of state action, and Houston makes no effort to dispute this conclusion.  *See id.*

##### 2.   *Constitutionally Inadequate Process*

Houston's motion to dismiss relies on the theory that Martin has not alleged sufficient facts to support the finding that the Act offers constitutionally inadequate process. His argument on this point is twofold. First, Houston contends that Martin, by evicting the residents prior to enforcement of the Act, foreclosed any opportunity to allege that the process available to him was inadequate. Second, he argues that Martin's claim that he was afforded inadequate process relies on an erroneous theory of law such that it does not implicate procedural due process concerns. These arguments will be addressed in turn.

##### a.   **Martin Need Not Have Availed Himself of the Allegedly Defective Statutory Procedure**

According to Houston, Martin's amended complaint is inadequate to state a procedural due process claim because it fails to allege that Martin attempted to use the allegedly defective procedures available to him under the statute. In support of this contention, Houston relies on the Eleventh Circuit's decision in *AFL-CIO v. City of Miami*, 637 F.3d 1179 (11th Cir. 2011). In that case, the Eleventh Circuit affirmed dismissal of the plaintiffs' procedural due process claim because the plaintiffs failed to allege how the challenged procedures were inadequate or that they had even attempted to use the procedures available to them. *Id.* at 1186. To the extent that Houston argues that Martin's procedural due process claim should be dismissed

merely because he brought a pre-enforcement challenge, the holding of *AFL-CIO* does not support such a proposition. *See id.* So long as Martin alleges facts demonstrating how the Act's process is inadequate, his pleading sufficient to survive a motion to dismiss. *See id.*

This is true regardless of whether he availed himself of the Act's procedures for judicial review. Where the statutory process is "unavailable or patently inadequate," the plaintiff need not make use of it before bringing a procedural due process challenge. *Alvin v. Suzuki*, 227 F.3d 106, 116 (3d Cir. 2000). And the facts alleged in Martin's complaint support the finding that the procedures provided in the Act are inadequate. Martin has alleged that, had he allowed an enforcement action to proceed before evicting his residents, the Act would have compelled a mandatory finding that his settlement constituted a public nuisance. He has further alleged that the District Attorney's office warned him that his settlement constituted a public nuisance under the Act. The Act, which employs the mandatory "shall," leaves no room for Martin to argue that his own settlement does not, as a matter of fact, constitute a nuisance. The enforcement action would serve no purpose beyond assessing the applicable fine. These allegations support the notion that the statutory process is inadequate. Accordingly, Martin's claim will not be dismissed on these grounds. *See AFL-CIO*, 637 F.3d at 1186; *Alvin*, 227 F.3d at 116.

### b. Martin's Claim Implicates Procedural Due Process Concerns

In support of his due process challenge, Martin alleges that the Act conclusively determines that a certain residential arrangement constitutes a public nuisance without requiring the court to make a factual determination as to whether his land use is harmful to others. This scheme runs afoul of the Fourteenth Amendment, according to Martin, because it denies him an opportunity to be heard before being deprived of his right to use his property in an otherwise legal manner. The Act's arrangement, according to Martin, creates an irrebuttable presumption that the settlement constitutes a public nuisance. *See Vlandis v. Kline*, 412 U.S. 441, 446 (1973). Cases dealing with similar situations recognize that such irrebuttable presumptions offend notions of due process. *See id.* This is because they deny a benefit to or place a burden on an individual without giving that individual an opportunity to rebut a finding essential to the ultimate outcome of the statutory calculus. *Id.*

In support of his motion to dismiss Martin's due process claim, Houston contends that the so-called irrebuttable presumption doctrine is dead letter. He argues that Martin's claim relies on this doctrine, and accordingly the claim does not implicate procedural due process concerns at all. Houston is correct in noting that the force of this doctrine has waned in the years since its inception. *See, e.g.,*

*Weinberger v. Salfi*, 422 U.S. 749, 772–73 (1975); *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976); *Michael H. v. Gerald D.*, 491 U.S. 110, 116 (1989); *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 6–7 (2003).  These cases evince disapproval of the doctrine's application under certain circumstances.   The retreat from the irrebuttable presumption doctrine, however, has not been wholesale.  *See Salfi*, 422 U.S. at 785 (upholding a statute creating an irrebuttable presumption because the programs at issue did not "involve affirmative Government action which seriously curtails important liberties cognizable under the Constitution").  A close read of the cases on which Houston relies reveals the doctrine's continued viability in situations where, as here, the plaintiff's claim can be characterized as procedural rather than substantive.  *See id.*

The cases in which the Supreme Court has signaled disapproval of the irrebuttable presumption doctrine share a common feature.  In each, where the Court declined to apply the doctrine to invalidate irrebuttable statutory presumptions, it did so because it determined that the plaintiff's claim was functionally substantive.[11]

---

[11] The confusion surrounding the application of the irrebuttable presumption doctrine is palpable.  The doctrine, by treating certain legislative policy choices as rules of procedure rather than rules of substance, makes itself vulnerable to abuse.  Consider the scenario in which a litigant's claim is in fact substantive in nature, but the right upon which he would base such a challenge has never been recognized as fundamental.  In the world of an unfettered irrebuttable presumption doctrine, it is in this litigant's interest to bring a substantive claim masquerading as a procedural claim.

In the years following *Vlandis*, the Supreme Court acknowledged the doctrine's evils.  *See Salfi*, 422 U.S. at 772 ("We think that the District Court's extension of *Stanley*, *Vlandis*, and *LaFleur* to the eligibility requirement in issue here would turn the doctrine of those cases into a

*See Michael H.*, 491 U.S. at 116.  In *Usery*, the Court recognized that Congress may impose certain irrebuttable presumptions by statute where, as a matter of substance, the presumption's "operation and effect are clearly permissible."  428 U.S. at 23–24.  In *Connecticut Department of Public Safety*, the Court rejected the plaintiff's due process claim after finding that the fact he alleged he was entitled to prove was immaterial to the outcome under the statute.  538 U.S. at 7.  The plaintiff in that case alleged that he was entitled to prove that he was not dangerous before being required to register under the state's sex offender statute.   Steering the claim into the substantive realm, the Court noted that "[u]nless [the plaintiff] can show that that *substantive* rule of law is defective (by conflicting with a provision of the Constitution), any hearing on current dangerousness is a bootless exercise."  *Id.* at 7–8 (emphasis in original).

---

virtual engine of destruction for countless legislative judgments which have heretofore been thought wholly consistent with the Fifth and Fourteenth Amendments to the Constitution.") (case names not italicized in original).  These later cases, though they recognize the danger of treating substantive laws as rules of procedure, create a doctrinal void without attempting to fill it.  The vacuum left in this realm of constitutional inquiry should not be used to shutter the courthouse doors against litigants wielding otherwise meritorious procedural due process challenges.  *See* D. Michael Risinger, *"Substance" and "Procedure" Revisited*, 30 UCLA L. Rev. 189, 215 (1982) (suggesting that the *Vlandis* line of cases was based on a constitutionally sound principle, and that where a substantive rule is procedurally based, it should be "analyzed as a denial of equal protection because admittedly different cases are treated alike").

There may be cases in which a quasi-substantive legislative presumption in fact employs constitutionally deficient procedures.  And where this is the case, litigants should be allowed to challenge the procedural aspects of the law.  The proper means of quelling the ructions associated with the irrebuttable presumption doctrine is a question for another day.  For purposes of resolving the instant motion, it is enough to say that Martin's allegations are sufficient to plead a procedural due process claim that is plausible on its face.

In *Michael H.*, a plurality of the Court squarely addressed the limitations of the irrebuttable presumption doctrine.   491 U.S. at 116.   Declining to treat the plaintiff's challenge to a statutory presumption as procedural, the plurality noted that his claim was in fact substantive in nature.   *Id.*   That case arose out of a paternity dispute in which a putative biological father challenged California's presumption that the mother's husband is the father of her child.   Treating the due process claim as substantive, the plurality noted that what the putative father actually sought, rather than a hearing to establish that he was the biological father, was a hearing to determine whether "California's policies would be best served by giving him parental rights."   *Id.* at 120.   In this sense, the plaintiff's claim was substantive in nature, and the plurality went on to address it as such.   *Id.*

Upon review of the factual allegations in the amended complaint, it cannot be said, at least for purposes of resolving this motion to dismiss, that Martin's claim is in fact substantive in nature.   He alleges that the Act designates his property as a public nuisance without the predicate finding that the settlement harms others.   He further alleges that the Act's mandatory language affords him no opportunity to be heard on this issue.   Alabama law provides that a public nuisance involves a land use that causes damage to persons around the property.   *See* Ala. Code § 6-5-121. What Martin seeks is a hearing in which he is allowed to rebut the factual presumption that his settlement in fact causes damage to those around it.   His claim,

because it expressly alleges procedural deficiencies rather than a substantive disagreement with the policy embodied in the public nuisance finding, can be fairly characterized as procedural.

Accordingly, Martin has adequately pleaded the three elements of a procedural due process claim. *Arrington*, 438 F.3d at 1347. Houston's motion to dismiss will be denied as to Martin's Fourth Cause of Action.

## V. CONCLUSION

Accordingly, it is ORDERED that Houston's 12(b)(1) motion to dismiss the amended complaint (Doc. # 25) for lack of subject-matter jurisdiction is DENIED. It is further ORDERED that Houston's 12(b)(6) motion to dismiss the amended complaint for failure to state a claim (Doc. # 25) is DENIED. With respect to Martin's RLUIPA claim in the First Cause of Action, Martin will be directed, by separate order, to show cause why this claim should not be dismissed for failure to plead a statutory basis of subject-matter jurisdiction.

DONE this 6th day of April, 2016.

_____
                    /s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE