IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| RICKY MARTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:14-CV-905-WKW |
| | ) | [WO] |
| RANDALL V. HOUSTON, in his | ) | |
| official capacity as district attorney | ) | |
| for Chilton County, Alabama, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This case presents a constitutional challenge to Alabama Code § 45-11-82, the so-called Chilton County Anti-Clustering Law.  (*See* Doc. # 22.)  After the denial of the Rule 12(b)(6) motion to dismiss filed by Defendant Randall V. Houston ("Houston") (Doc. # 37), the Alabama legislature repealed the Anti-Clustering Law. Houston's second motion to dismiss followed hot on the repeal's trail, and is before the court today.  (Doc. # 46.)  Houston alleges that the repeal mooted this action, requiring its dismissal and the vacatur of the orders entered in the case to date.  He is half-right:  Although the repeal compels a finding that this case has become moot, under these facts the court declines to grant the equitable remedy of vacatur.

# I.  JURISDICTION AND VENUE

At issue is whether this dispute presents a justiciable case or controversy such that the court may exercise subject-matter jurisdiction.  The parties do not contest personal jurisdiction or venue.

# II.  STANDARD OF REVIEW

A Rule 12(b)(1) motion directly challenges the district court's subject-matter jurisdiction.  *Gilmore v. Day*, 125 F. Supp. 2d 468, 470 (M.D. Ala. 2000).  "Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction can be asserted on either facial or factual grounds."  *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009) (citing *Morrison v. Amway Corp*., 323 F.3d 920, 925 n. 5 (11th Cir.2003)).  "Facial challenges to subject matter jurisdiction are based solely on the allegations in the complaint.  When considering such challenges, the court must, as with a Rule 12(b)(6) motion, take the complaint's allegations as true."  *Id.*  On the other hand, a "factual attack" challenges "jurisdiction in fact, irrespective of the pleadings."  *Morrison*, 323 F.3d at 925. In a factual attack, "matters outside the pleadings, such as testimony and affidavits, are considered."  *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (citation omitted).  Houston's motion to dismiss raises a factual attack, as it stems from the Anti-Clustering Law's repeal—a question of fact outside of the pleadings.  *See Morrison*, 323 F.3d at 925.  Accordingly, "no presumptive truthfulness attaches to [P]laintiff's

allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Lawrence*, 919 F.2d at 1529 (citation omitted).  The burden of proving jurisdiction falls on Plaintiff. *Underwriters at Lloyd's, London v. Osting-Schwinn*, 613 F.3d 1079, 1085 (11th Cir. 2010) ("The party commencing suit in federal court . . . has the burden of establishing, by a preponderance of the evidence, facts supporting the existence of federal jurisdiction.").

## III. BACKGROUND

The court already detailed the facts and procedural history of this case in the Memorandum Opinion and Order denying Houston's prior motion to dismiss and will expand on them only where relevant to its analysis. (*See* Doc. # 37 at 3–8); *Martin v. Houston*, 176 F. Supp. 3d 1286, 1290–92 (M.D. Ala. 2016).  However, the intervening repeal of the Anti-Clustering Law merits further discussion.

Plaintiff Ricky Martin ("Martin"), the pastor of Triumph Church in Clanton, Alabama, now finds himself free to resume his Christian ministry to homeless sex offenders.  On August 30, 2016, Governor Robert Bentley signed into law Alabama Act No. 2016-466 (the "repeal"), an express repeal of the Anti-Clustering Law. (Doc. # 46-1 at 6–7.)  The repeal was passed during a special legislative session, spending two days in the Senate and six days in the House before it was signed into law.  (Doc. # 54-8 at 2–3.)  No legislative history or other "record of deliberation"

3

explains the legislature's motivation in passing the repeal.  (Doc. # 54 at 7.)  The repeal ended two years of legislative interference with Martin's religious calling.[1] Martin may welcome ASORCNA registrants into his congregation once again—and indeed has professed his intent to do so.[2]  (Doc. # 46-2 at 2.)  Some forty-eight hours after the repeal's enactment, Houston filed the motion to dismiss that is before the court today.  (Doc. # 46.)

## IV.  DISCUSSION

Houston claims in his motion that the repeal rendered moot Martin's challenge to the Anti-Clustering Law.  (*See generally* Doc. # 46.)  More than just dismissal, Houston urges that the repeal compels the vacatur of the court's prior orders in this case.  (Doc. # 46 at 5–9; *see* Docs. # 37, 45.)  For his part, Martin contends that the legislature repealed the Anti-Clustering Law to manipulate the court's jurisdiction and avoid paying his attorneys' fees.  (*See generally* Doc. # 54.)  He further claims that vacatur would be improper, both because "there is no judgment to eliminate" and because Houston could have sought review of the orders sought to be vacated. (Doc. # 54 at 8 n.6.)  The questions of mootness and vacatur are discussed in turn.

---

[1] To what extent District Attorney Houston is responsible for this piece of constitutionally offensive legislation is not revealed in the record.  He got busy getting it repealed, probably because the Act required his services to enforce and because he was thus sued.  One assumes the Alabama Legislature also shares paternity.

[2] The record is unclear as to whether Martin has already resumed his ASORCNA ministry.

### A.   <u>Mootness</u>

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Chief among the limits on federal jurisdiction is the Article III edict that federal courts may only pass judgment on "Cases" and "Controversies." U.S. Const., art. III, § 2, cl. 1; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60 (1992). "Because the judiciary is unelected and unrepresentative, the Article III case-or-controversy limitation, as embodied in justiciability doctrine, presents an important restriction on the power of the federal courts." *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1244 (11th Cir. 1998). The court's decision today rests on one branch of the doctrine of justiciability: mootness.

"There must be a present, live controversy in order to avoid advisory opinions on abstract propositions of law. When the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome, the case has become moot." *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1309 (11th Cir. 2000) (alterations, internal citations, and quotation marks omitted). "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.'" *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 727 (2013) (quoting *Alvarez v.*

*Smith*, 558 U.S. 87, 93 (2009)). "Plainly, if a suit is moot, it cannot present an Article III case or controversy and the federal courts lack subject matter jurisdiction to entertain it." *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328 (11th Cir. 2004) (citing *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001) (*per curiam*)).

It takes no great feat of logic to find that this case no longer presents a live controversy. In his operative complaint, Martin sought only declaratory and injunctive relief vis-à-vis the Anti-Clustering Law; he did not seek even nominal damages. (*See* Doc. # 22 at 16.) With that law orphaned, there remains no "effectual relief" that Martin may be granted. *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012). And while Martin does ask for attorneys' fees, this alone will not sustain a justiciable claim. *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990) ("[An] interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim."). Thus, on first blush it would appear that this case is now moot.

But the analysis does not end there. "[I]t has long been the rule that voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot." *Harrell v. Fla. Bar*, 508 F.3d 1241, 1265 (11th Cir. 2010) (quoting *Nat'l Advert. Co. v. City of Miami*, ("*National II*"), 402 F.3d 329, 1333 (11th Cir. 2005) (alteration and internal

quotation marks omitted). "Otherwise, a party could moot a challenge to a practice simply by changing the practice during the course of the lawsuit, and then reinstate the practice as soon as the litigation was brought to a close." *Jews for Jesus, Inc. v. Hillsborough Cty. Aviation Auth.*, 162 F.3d 627, 629 (11th Cir. 1998). Therefore, the standard for determining whether a defendant's voluntary conduct has mooted a case is a "stringent" one. *Id.* A case becomes moot only if later events make it "'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)); *see also Already*, 133 S. Ct. at 727 (recognizing the "formidable burden" posed by the voluntary cessation doctrine). "The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Laidlaw*, 528 U.S. at 189 (citing *Concentrated Phosphate*, 393 U.S. at 203) (alteration and internal quotation marks omitted).

Houston's claim that the proper analytical framework is simple mootness rather than voluntary cessation must be addressed before launching into the voluntary-cessation inquiry. (*See* Doc. # 55 at 1–2.) Houston argues that the repeal was the handiwork of the Alabama legislature and that he, a representative of a separate branch of government, played no part in the repeal process. Therefore, he

continues, this case is "no different from a case where, say, one of the parties has died." (Doc. # 55 at 2.)  Hogwash.  This lawsuit is another chapter in the legal fiction penned by *Ex parte Young*, 209 U.S. 123 (1908).  The Eleventh Amendment bars a direct suit against the State itself, leaving Houston as the only party against whom Martin can seek to vindicate his rights.  *See Green v. Mansour*, 474 U.S. 64, 68 (1985).  To hold the voluntary-cessation framework inapplicable in this situation would be to undermine federal enforcement of the Constitution against state legislation; couching a legislative repeal as an external cause of mootness would allow a state government to dodge judicial review willy-nilly, simply by repealing challenged laws.  The analysis thus proceeds under the voluntary-cessation rubric.

The Eleventh Circuit has sketched out a special set of rules that apply where the defendant who claims to have changed his ways is a governmental actor.  When dealing with a governmental defendant, the court turns to a three-factor test to determine whether the cessation of challenged conduct will moot the challenge.  *See Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 531–32 (11th Cir. 2013).  First, the court must ask "whether the termination of the offending conduct was unambiguous."  *Id.* at 531 (quoting *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, ("*NABP*"), 633 F.3d 1297, 1310 (11th Cir. 2011)).  Second, the court "look[s] to whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate

8

jurisdiction." *Id.* at 532 (quoting *NABP*, 633 F.3d at 1310).  And third, the court "ask[s] whether the government has 'consistently applied' a new policy or adhered to a new course of conduct." *Id.* (quoting *NABP*, 633 F.3d at 1310).  If the answer to the first question is yes—*i.e.*, if the governmental defendant unambiguously has terminated the offending conduct—the court invokes a rebuttable presumption of mootness.[3] *Jacksonville Prop. Rights Ass'n v. City of Jacksonville, Fla.*, 635 F.3d 1266, 1274–75 (11th Cir. 2011) ("[T]his Court has consistently held that a challenge to a government policy that has been unambiguously terminated will be moot in the absence of some reasonable basis to believe that the policy will be reinstated if the suit is terminated.") (quoting *Troiano v. Supervisor of Elections in Palm Beach Cty., Fla.*, 382 F.3d 1276, 1285 (11th Cir. 2004)); *see also Harrell*, 608 F.3d at 1266.  Finally, to determine whether this so-called "*Troiano* presumption" attaches, the court considers "the timing and content of the decision" to cease the conduct.  *Rich*, 716 F.3d at 531 (quoting *Harrell*, 608 F.3d at 1266).

---

[3] Arguably, this presumption burdens the party least likely to carry it.  After all, if a change in policy is a sham, who would know better than the policymaker?  But the presumption reflects sound considerations of federalism.  "To adopt [the] view that mere repeal is insufficient to moot a case would essentially put this court in the position of presuming that the [governmental defendant] has acted in bad faith—harboring hidden motives to reenact the statute after we have dismissed the case—something we ordinarily do not presume."  *Fed'n of Advert. Indus. Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 929 (7th Cir. 2003) (citing *N.E. Fla. Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 677 (1993) (O'Connor, J., dissenting)).  "At least in the absence of overwhelming evidence (and perhaps not then), it would seem inappropriate for the courts either to impute such manipulative conduct to a coordinate branch of government, or to apply against that branch a doctrine that appears to rest on the likelihood of a manipulative purpose."  *Clarke v. United States*, 915 F.2d 699, 705 (D.C. Cir. 1990).

Accordingly, the analysis starts with asking whether the repeal brought an unambiguous end to the challenged conduct—namely, the enforcement of the Anti-Clustering Law.  The timing of the repeal informs this inquiry, *Rich*, 716 F.3d at 531, and hardly paints a rosy picture for the legislature.  On April 6, 2016, the court issued its Memorandum Opinion and Order denying Houston's motion to dismiss. (Doc. # 36.)  Within a week, the parties began communicating about how to proceed with the case in a manner that would expedite a final decision and, ultimately, appellate review.  (*See generally* Doc. # 54-1.)  By April 22, the parties were discussing whether the case could be settled.[4]  (Doc. # 54 at 4.)  Martin's claim for attorneys' fees emerged as a point of contention: Despite Houston's request for a waiver of fees, Martin insisted on settlement terms that provided for his counsel's compensation.  (Doc. # 54 at 4.)  Houston ultimately told Martin, via email, that litigation would continue "if fees are important to you."  (Doc. # 54-3 at 2.)  They were, so the parties' communication lapsed until mid-June.  (*See* Doc. # 54-4.)

---

[4] Martin correctly notes that these settlement talks are properly before the court.  (*See* Doc. # 54 at 4 n.1.)  Although Federal Rule of Evidence 408(a) excludes evidence of "conduct or a statement made during compromise negotiations" when introduced "to prove or disprove the validity or amount of a disputed claim," subsection (b) expressly allows the admission of such evidence "for another purpose."  Fed. R. Evid. 408(a), (b); *accord Fisk Elec. Co. v. Solo Constr. Corp.*, 417 F. App'x 898, 902 (11th Cir. 2011).  Martin offers evidence of these communications to cast doubt on the timing of the repeal, not to prop up the validity of his claim.  Accordingly, they are admissible, and a proper subject of judicial consideration under the factual-attack standard of review.  *See Lawrence*, 919 F.2d at 1529 (explaining that courts may review "matters outside the pleadings" on review of a factual attack to subject-matter jurisdiction).

Once it became clear that the case would not be dismissed[5] and Martin would not waive his claim for fees, the legislative gears began to grind into motion.  Per the Alabama Constitution, a local law like the Anti-Clustering Law or its repeal must "be published at least once a week for four consecutive weeks" in the relevant county.  Ala. Const. art. IV, § 106.  Houston's office began the requisite publishing cycle on May 19—hardly a month after the denial of the motion to dismiss.  (Doc. # 54-7 at 2.)  Tellingly, the text of the proposed bill published in the Chilton County News is exactly the same as the text of the law that was ultimately enacted, Alabama Act No. 2016-466.  (*Compare* Doc. # 54-7 at 2 *with* Doc. # 46-1 at 6.)  In about a month's time, Houston's litigation strategy shifted from seeking dismissal, to seeking settlement, to seeking a legislative repeal.[6]  A scant three weeks separated the publication of the bill and Martin's stand on attorneys' fees.  And, because the

_____

[5] To be sure, at this point the court had not yet decided whether it had jurisdiction over Martin's RLUIPA claim.  (*See* Doc. # 38 (ordering Martin, on April 6, 2016, to show cause why the claim should not be dismissed for lack of subject-matter jurisdiction).)  But after the court's April 6 denial of Houston's motion to dismiss, wholesale dismissal of Martin's action was no longer on the table.  (*See* Doc. # 37.)

[6] The parties disagree on Houston's role in bringing about the repeal, and whether it properly may be characterized as his litigation strategy.  Martin alleges that Houston "work[ed] to secure the repeal of the challenged statute" (Doc. # 54 at 6), while Houston characterizes the repeal as a wholly "external event[ ]" (Doc. # 55 at 2).  Although the timing and greater context of the repeal give it the look of a strategy pursued affirmatively by Houston, the court declines to order additional briefing or evidentiary submissions on the matter.  As explained below, the fact of a legislative repeal requires a finding of unambiguous termination, thereby obviating the inquiry into the timing and content of the decision to cease the challenged conduct.  *See Rich*, 716 F.3d at 531; *cf. also Lawrence*, 919 F.2d at 1529 (existence of factual disputes does not bar the court from deciding a factual attack on its jurisdiction).

11

proposed bill was later enacted verbatim, it was likely the result of some degree of deliberation—placing the decision to repeal even closer in time to Martin's insistence on fees.  Given this timeline, the undersigned struggles to see the repeal as anything other than an attempt to finagle out of paying Martin's attorneys' fees.

Such a finding would reflect the weight of precedent on voluntary cessation by governmental actors.  Courts tend to look askance at defendants who claim to have changed their ways but only brought their conduct to an end after suit was filed. *See, e.g.*, *Rich*, 716 F.3d at 532 (casting doubt on policy change made only after suit was filed and holding that the challenged conduct had not unambiguously terminated); *NABP*, 633 F.3d at 1312 (holding that policy was not unambiguously terminated, in part because its cessation was not announced until a hearing for a preliminary injunction); *Harrell*, 608 F.3d at 1267 (noting that post-litigation change in policy did not unambiguously terminate the challenged conduct); *see also Jager v. Douglas Cty. Sch. Dist.*, 862 F.2d 824, 833–34 (11th Cir. 1989) (pointing out that a change in policy "[u]nder the imminent threat of the [plaintiffs'] lawsuit" evinced ambiguity of termination).  This is a logical stance:  Post-suit cessation of conduct is more likely a response to the suit than a true change of heart by the defendant. This rationale is all the more convincing here, where the Anti-Clustering Law was not repealed until after the denial of Houston's first dispositive motion.  The state

legislature, having already robbed Martin of his ASORCNA congregation, appears to have passed the repeal to rob him of the compensation owed to his attorneys.

But, despite the apparent legislative skullduggery, Eleventh Circuit precedent commands a finding of unambiguous termination.    The voluntary-cessation jurisprudence puts particular credence in the lack of ambiguity in repealing a statute—even when there are other reasons to doubt the defendant's good faith.  *E.g.*, *Harrell*, 608 F.3d at 1266–67 (explaining that "a clandestine or irregular" decision "to cease a challenged behavior" will not qualify as unambiguous cessation, unless it takes the form of a statutory repeal).   Indeed, when faced with the repeal of a challenged statute, the Eleventh Circuit has applied the *Troiano* presumption without further question or comment.   *See Coral Springs*, 371 F.3d at 1328–29.   This generous grant of latitude jives with Supreme Court precedent, too.   Time and again, the Court has held that claims for injunctive relief become moot upon the repeal (or amendment) of the challenged statute.  *E.g.*, *Lewis*, 494 U.S. at 474; *Massachusetts v. Oakes*, 491 U.S. 576, 582–83 (1989); *Princeton Univ. v. Schmid*, 455 U.S. 100, 103 (1983) (*per curiam*); *Kremens v. Bartley*, 431 U.S. 119, 128–29 (1977); *Diffenderfer v. Cent. Baptist Church, Inc.*, 404 U.S. 412, 415 (1972).   This precedent compels a finding that the repeal of the Anti-Clustering Law brought an

unambiguous termination to the challenged conduct.[7]   The *Troiano* presumption

therefore attaches, and the court evaluates the remaining two factors to determine

whether Martin can carry the burden of persuasion.[8]

In his briefing, Martin did not argue that the third factor—the consistent

application of the new policy or course of conduct—militated against a finding of

mootness.   (*See* Doc. # 54 at 3.)   Thus, the matter hinges on whether the repeal

"appears to be the result of substantial deliberation, or is simply an attempt to

manipulate jurisdiction."   *Rich*, 716 F.3d at 532.

---

[7] The parties make three additional arguments regarding the ambiguity, *vel non*, of the repeal, but none change the result.   First, Martin claims that Houston's request for vacatur demonstrates a desire "to be free to relitigate the same issues in the future."   (Doc. # 54 at 8.)   But Houston takes the air out of this argument by rightly pointing out that a vacatur principally serves to limit the extent to which other opinions are influenced by the prior orders entered by the court. (Doc. # 46 at 8.)   Second, Martin uses the declaration of registered Alabama lobbyist Winston J. Leavell to claim that "it would be easy" for the legislature to reenact the Anti-Clustering Law. (Docs. # 54 at 7–8; 54-9.)   This argument mistakes ease of action for likelihood of action and fails to show ambiguity in the repeal of the Anti-Clustering Law.   And third, Houston proffers his own declaration claiming that no legislator ever suggested to him "that he or she would seek re-enactment of [the Anti-Clustering Law] or a materially similar position."   (Docs. # 46 at 4–5; 46-1.)   Absence of evidence is not evidence of absence; this, too, fails to persuade.

[8] The Eleventh Circuit's evolving voluntary-cessation jurisprudence remains unclear as to how to proceed analytically after a finding of unambiguous cessation.   However, the precedent generally requires some showing of concrete evidence of the defendant's bad faith or intent to reenact the repealed law.   *E.g.*, *National II*, 402 F.3d at 1334 (requiring "evidence of a 'substantial likelihood' that the challenged statute will be enacted" to avoid mootness); *Coral Springs*, 371 F.3d at 1333 (finding case moot absent "indication . . . that the [defendant] repealed its old Sign Code in bad faith, intending to reinstate it later").   Thus, the court will evaluate whether "there is some reason to believe that the [Anti-Clustering Law] may be reenacted after dismissal of the suit," as based on the remaining two factors and with the *Troiano* presumption of mootness in mind. *Coral Springs*, 371 F.3d at 1329.

Martin claims that the legislative timeline and lack of legislative history show that the repeal was not the product of deliberative reasoning.  (Doc. # 54 at 6–8.)  As noted by Martin, "[t]he bill moved with lightning speed through the legislative special session."  (Doc. # 54 at 6 n.8.)  Between its first reading and ultimate passage, the bill was before the Senate for two days and the House for six days.  No bill passed so hurriedly, Martin surmises, could have enjoyed substantial deliberation.  (Doc. # 54 at 7.)  Houston, by contrast, looks at this same abbreviated schedule and finds an overabundance of deliberation.  He claims that the bill "survive[d]" committee hearings, four weeks of newspaper publication, and legislative readings and votes; it therefore passes muster.  (Doc. # 55 at 5.)  In other words, because the state legislature followed its own procedures in enacting the repeal, the repeal must have been the product of substantial deliberation.  The undersigned disagrees.  Although courts have recognized an abandonment of procedures as a sign of jurisdictional manipulation, *e.g.*, *Harrell*, 608 F.3d at 1267, it does not follow that merely abiding by proper procedures demonstrates substantial deliberation.[9]  Were that the case, all legislation lawfully passed by the State of Alabama would clear the bar; repealing a

---

[9] *But see Jacksonville Prop. Rights Ass'n*, 635 F.3d at 1275 (deriving minimal significance from the fact that the defendant followed lengthy administrative procedures and opining that "[t]he [defendant] is unlikely to jump through those bureaucratic hoops again").  The *Jacksonville* court gave great weight to the defendant's position, maintained throughout the entire litigation, that the challenged law did not apply to bar the plaintiff's conduct. *Id.* at 1273–75.  Houston has made no such assurance—which is unsurprising, given Martin's allegation that the Anti-Clustering Law was a bill of attainder—so the court refuses to treat mere compliance with legislative procedure as proof of substantial deliberation.

law would automatically—rather than presumptively—moot a judicial challenge. With that in mind, the court takes the repeal's rapid passage as some evidence that the legislature aimed to manipulate the court's jurisdiction.

Martin further argues that the lack of legislative history shows a lack of substantial deliberation.  He points out that neither the bill nor Houston's declaration (Doc. # 46-1) gives any rationale for the repeal.  Therefore, "[t]o the extent that there was any legislative concern for safety (however baseless those concerns may have been), . . . those concerns will remain the same as Pastor Martin re-establishes that portion of his ministry." (Doc. # 54 at 7.)  This is convincing logic:  Absent a change in either the circumstances or the legislature's reasoning, the repeal smacks of an attempt to close the courthouse doors, not a reasoned re-charting of the legislature's path.  But, in fairness, the Anti-Clustering Law itself also was enacted without leaving a trace of legislative history.  And more significantly, the court is leery of creating precedent demanding extensive legislative history for a finding that a law was the product of substantial deliberation.  Regardless, the complete lack of any "record of deliberation" by the lawmakers weighs in favor of a finding of jurisdictional manipulation.  (*See* Doc. # 54 at 7.)

But is this enough to rebut the *Troiano* presumption?  A hard look at relevant precedent suggests not.  More than just "speculation that [Houston or the legislature] may return to [their] previous ways," Martin must adduce "concrete evidence of

secret intentions." *National II*, 402 F.3d at 1334.   Prior Eleventh Circuit and Supreme Court cases inform whether Martin's evidence regarding the timing and speed of the repeal's passage meets this burden.

Only twice has the Eleventh Circuit or the Supreme Court found a justiciable case or controversy despite the repeal or amendment of a challenged law.[10]  *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982); *Nat'l Advert. Co. v. City of Ft. Lauderdale*, ("*National I*"), 934 F.2d 283 (11th Cir. 1991).  *National I* offers only minimal help: in finding that a billboard company's challenge to Fort Lauderdale's sign code remained a live case or controversy after the code's amendment, the court reasoned simply that "[i]t remain[ed] uncertain whether the City would return the sign code to its original form if it managed to defeat jurisdiction in this case." *National I*, 934 F.2d at 286.  The court based this logic on the City's "power and authority to amend the sign code," which it "presently possess[ed]," but also remarked that the City failed to "establish[ ] that the likelihood of further violations is sufficiently remote to dismiss National's claims."  *Id.*  Unlike under the *Troiano* presumption, this analysis puts the burden on the defendant to prove mootness; that portion of *National I*'s rationale does not control this decision.  However, the

---

[10] Both cases predate the Eleventh Circuit's articulation of the *Troiano* presumption and thus are of limited use in deciding whether Martin has rebutted the presumption.  However, insofar as *Troiano* clarified rather than overruled the Eleventh Circuit's precedent on voluntary cessation, these cases bind the court.  They inform the voluntary-cessation inquiry by establishing a baseline set of facts under which mootness is not justified.

"present[ ] possess[ion] [of] power and authority to amend" remains a pertinent factor and weighs in Houston's favor.  Assuming, as Martin alleges, that Houston directly caused the repeal of the Anti-Clustering Law—*i.e.*, that Houston had the *de facto* power to amend or repeal the law—he undeniably lacked, and lacks, the actual authority to do so.  Thus, while comparison to *National I* is only marginally helpful, it tilts the scales in Houston's favor.

*Aladdin's Castle* is much more instructive and merits full discussion.  In that case, the City of Mesquite had passed an ordinance governing the operation of "coin-operated amusement establishments."  455 U.S. at 285.  Section 6 of the ordinance required the chief of police to evaluate all applicants' "connections with criminal elements"; Section 5 prohibited the admission of children under the age of seventeen into a licensed establishment, unless accompanied by a legal guardian.  *Id.* at 286.  Aladdin's Castle sought to open such an "amusement center" in a Mesquite shopping mall, and the city government accommodated that aim by writing an age exemption into Section 5 of the ordinance, requiring accompaniment by a legal guardian only for minors under the age of seven.  *Id.*  However, Aladdin's Castle was ultimately denied a license after the chief of police concluded that the establishment had "connections with criminal elements."  *Id.* at 287.  Aladdin sued in state court, where it obtained an injunction requiring the City to issue it a license.  *Id.*  Within a month after complying with the state-court order, the City repealed the age exemption in

Section 5 and defined the "connections with criminal elements" language in Section 6. *Id.* Aladdin then sued in federal court, seeking an injunction against enforcement of the newly amended ordinance's age restriction and criminal-elements requirement. *Id.* at 287–88. The trial court upheld Section 6's age restriction but struck down Section 5's criminal-elements language as unconstitutionally void; the Fifth Circuit reversed the ruling on Section 6 and affirmed on Section 5. *Id.* at 288. Before the Supreme Court could pass judgment on the matter, the City once again amended the ordinance, this time eliminating the "connections with criminal elements" language. The age restriction, however, stayed in place. *Id.* Reviewing the matter for mootness, the Court held that a live controversy remained. *Id.* at 289. Central to the Court's reasoning were (1) the City's prior gamesmanship with the Section 6 age restriction and (2) the City's brazen announcement at oral argument that it would reenact the provision if the judgment were vacated. *Id.* at 289, 289 n.11. Thus, the Court found that "the city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated" and held that the matter was not moot. *Id.* at 289.

*Aladdin's Castle* presents a high bar—one that Martin cannot clear.[11] Although the Alabama legislature is similarly "not preclude[d] . . . from reenacting"

---

[11] To be clear, the court does not read *Aladdin's Castle* to set out minimum requirements for a finding that voluntary cessation failed to moot a claim; even drawing the line well short of the facts in *Aladdin's Castle*, Martin's claim has become moot. Regardless, the rarity of the

the Anti-Clustering Law, *id.*, the apparent jurisdictional shenanigans do not measure up to the City of Mesquite's unflinching disregard for the judiciary.  There is no open admission of intent to reenact, nor is there a history of gamesmanship from which such intent could be inferred.  Of course, the court cannot—and does not— ignore the nefarious backdrop of the Anti-Clustering Law's original enactment.  But absent the sort of indicia of manipulation seen in *Aladdin's Castle*, the undersigned trusts that the legislature has acted in good faith here—and indeed must presume that it did, *Troiano*, 382 F.3d at 1285—even in the face of some circumstantial evidence to the contrary.

A finding of mootness meshes with prior cases calling for "evidence indicating that the government intends to return to its prior legislative scheme." *National II*, 402 F.3d at 1334; *see also Coral Springs*, 371 F.3d at 1329 (requiring a showing of "a substantial likelihood that the challenged statutory language will be reenacted" to avoid mootness); *cf. Clarke*, 915 F.2d at 705 (requiring "overwhelming evidence" of manipulation).  The evidence adduced by Martin is too speculative, too abstract, and too circumstantial; it calls for too attenuated a chain of logic to find that the state legislature would "return to its prior legislative scheme."  *See National II*, 402 F.3d at 1334.  Especially when considering this evidence in light of the

---

holding in that case—*i.e.*, that a challenge to a law was not mooted by the law's repeal—suggests that the post-repeal survival of a live controversy requires similarly blatant evidence of manipulative intent.

*Troiano* presumption of mootness, the court has no choice but to find that the repeal mooted this case.

Analogous Eleventh Circuit case law reinforces this result, too.  Research unearthed six decisions holding that a governmental defendant's voluntary cessation did not moot a claim for injunctive relief.  *Rich*, 716 F.3d 525; *NABP*, 633 F.3d 1297; *Harrell*, 608 F.3d 1241; *Am. Civil Liberties Union v. Fla. Bar*, 999 F.2d 1486 (11th Cir. 1993); *National I*, 934 F.2d 283; *Jager*, 862 F.2d 824.  Each of these cases held (explicitly or implicitly) that the cessation was ambiguous and therefore are of limited value to this analysis: ambiguity of cessation, by itself, justifies the claim's survival and distinguishes those cases from the unambiguous repeal of the Anti-Clustering Law.  *Rich*, 716 F.3d at 532; *NABP*, 633 F.3d at 1311; *Harrell*, 608 F.3d at 1267; *Am. Civil Liberties Union*, 999 F.2d at 1495; *National I*, 934 F.2d at 286; *Jager*, 862 F.2d at 833–34.  But in one case, the Eleventh Circuit went so far as to say that the plaintiff's claims would not be moot even if the *Troiano* presumption of mootness were applied.[12]  *NABP*, 633 F.3d at 1311–12.  That case, *NABP*, presents the most compelling argument for the mootness of Martin's claims.  Not only did

---

[12] The *NABP* court held that the challenged conduct "had not been unambiguously terminated," making improper the application of the *Troiano* presumption.  633 F.3d at 1311; *see Harrell*, 608 F.3d at 1266 (explaining that the *Troiano* presumption only applies where the conduct has been unambiguously terminated).  The court's assertion that the case was not moot even if the presumption were applied is therefore dicta.  But even if it does not bind the undersigned, it carries ample persuasive strength.  *See Drummond Co. v. Collingsworth*, 816 F.3d 1319, 1326 (11th Cir. 2016) ("[D]icta can be considered for whatever persuasive value it may have.") (quoting *Castillo v. Sec'y, Fla. Dep't of Corr.*, 722 F.3d 1281, 1291 (11th Cir. 2013)).

the *NABP* defendant continue in his challenged conduct until the trial court held a hearing for a preliminary injunction, he continued to challenge the illegality of the conduct, announced his intention to later return to that course of conduct, and failed to give a "reasoned basis for voluntarily ceasing the infringing conduct." *Id.* at 1312. Houston, by comparison, is a choirboy. Although he did not obtain the repeal until after the court's denial of his motion to dismiss, he no longer claims that the Anti-Clustering Law passed constitutional muster, and has done his best to convince the court that he will continue to refrain from disrupting Martin's ministry. (*See* Doc. # 46-1 at 1–3.) Houston's entitlement to the *Troiano* presumption and the absence of the sort of "overwhelming evidence" that would justify the "imput[ation] of such manipulative conduct to a coordinate branch of government," *Clarke*, 915 F.2d at 705, suffice to show that Martin's claims are now moot. In light of the legislative interference with Martin's ministry—and the likely pivotal role played by Martin's suit in bringing about the repeal—the undersigned is reluctant to reach a result that could deny Martin the attorneys' fees that he claims. Eleventh Circuit precedent, however, binds the court to a finding of mootness.

Even though the legislature managed to close the courthouse doors, it cannot lock them shut. If the legislature were to put the Anti-Clustering Law back on the books, Martin may reinstate his lawsuit. And if suit were reinstated, the defendant would not be able to worm out of paying attorneys' fees by obtaining a second

repeal. *Jews for Jesus, Inc.*, 162 F.3d at 630; *see also National II*, 402 F.3d at 1335. Rather, "such 'flip-flopping' would create a reasonable expectation" that the law would be reenacted, thereby precluding a finding of mootness and all but ensuring a ruling on the merits. *Jews for Jesus, Inc.*, 162 F.3d at 630.

## B.   <u>Vacatur</u>

"The equitable remedy of vacatur ensures that 'those who have been prevented from obtaining the review to which they are entitled are not treated as if there had been a review.'" *Camreta v. Greene*, 563 U.S. 692, 712 (2011) (quoting *United States v. Munsingwear*, 340 U.S. 36, 39 (1950)). Vacatur "clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance." *Munsingwear*, 340 U.S. at 40. Because vacatur is an equitable remedy, it will be granted only if found to be in the public interest. *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994). "Judicial precedents are presumptively correct and valuable to the legal community as a whole. They are not merely the property of private litigants and should stand unless a court concludes that the public interest would be served by a vacatur." *Id.* at 26–27 (quoting *Izumi Seimitsu Kogyo Kabushiki Kaisha v. U.S. Philips Corp.*, 510 U.S. 27, 40 (1993) (Stevens, J., dissenting)). The court concludes that vacatur is not in the public interest, and that the repeal was not the product of "happenstance." *See Munsingwear*, 340 U.S. at 40. Accordingly, Houston cannot

show "equitable entitlement to the extraordinary remedy of vacatur," *U.S. Bancorp*, 513 U.S. at 26, and his request for vacatur will be denied.

The Supreme Court has long recognized "that the public interest is best served by granting relief when the demands of 'orderly procedure' cannot be honored." *Id.* at 27 (internal citation omitted) (quoting *Munsingwear*, 340 U.S. at 41). Conversely, "the public interest requires those demands to be honored when they can." *Id.* As explained by the *Bancorp* Court,

> Congress has prescribed a primary route, by appeal as of right and certiorari, through which parties may seek relief from the legal consequences of judicial judgments. To allow a party who steps off the statutory path to employ the secondary remedy of vacatur as a refined form of collateral attack on the judgment would—quite apart from any considerations of fairness to the parties—disturb the orderly operation of the federal judicial system.

*Id.* Houston "step[ped] off the statutory path" in seeking a repeal of the Anti-Clustering Law rather than appellate review of the court's orders. Equity frowns upon a grant of vacatur premised on "mootness [caused] by voluntary action." *Id.* at 24. Moreover, given that the parties still hotly contest whether the repeal brought about a permanent change in policy, the public interest is best served by keeping the court's orders on the books. The public interest therefore counsels against a grant of vacatur, making that remedy improper.

Similarly—and as an alternative basis for this decision—the repeal was not the product of happenstance, but rather resulted from Houston's concerted effort to

moot the issue and avoid paying attorneys' fees.  Vacatur protects parties from judgments left unreviewed due to the "vagaries of circumstance"; it does not allow a party to moot his own case, then turn around and ask the court to wipe clean the slate of litigation.  *Camreta*, 563 U.S. at 712 (citation omitted); *cf. U.S. Bancorp*, 513 U.S. at 24 (explaining that voluntary settlement of a case does not justify vacatur of the orders entered in that case).  Houston points to three appellate decisions that he claims "recognize[ ] the propriety of vacatur in the event of a legislative repeal or amendment."  (Doc. # 46 at 7); *Khodara Envtl., Inc. ex rel. Eagle Envtl. L.P. v. Beckman*, 237 F.3d 186 (3d Cir. 2001); *Valero Terrestrial Corp. v. Paige*, 211 F.3d 112 (4th Cir. 2000); *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346 (D.C. Cir. 1996).  These out-of-circuit decisions do not bind the court.  Moreover, none of the cited opinions confronted a repeal or amendment obtained with the purpose of avoiding an adverse judgment, greatly reducing their persuasive value in this case.  Houston may have been able to obtain the repeal, but he will not obtain vacatur of the court's prior orders.

## V. CONCLUSION

Accordingly, it is ORDERED as follows:

1.      Houston's motion to dismiss (Doc. # 46) is GRANTED insofar as it seeks dismissal of this action as moot;

2.      Houston's motion to dismiss (Doc. # 46) is DENIED insofar as it seeks

vacatur of the court's prior orders; and

3.      This case is DISMISSED without prejudice.

A final judgment will be entered separately.

DONE this 23rd day of December, 2016.

                              _____
                                      /s/ W. Keith Watkins
                              CHIEF UNITED STATES DISTRICT JUDGE